In the Matter of NORTH AMERICAN DEALER GROUP, INC., a/k/a North American Dealers Services, Inc., Debtor.

Daniel McCOLLEY, as Trustee of North American Dealer Group, Inc., a/k/a North American Dealers Services, Inc., Plaintiff,

v.

Howard S. BASS, the Brooklyn Savings Bank, and the Internal Revenue Service, Defendants.

Bankruptcy No. 180–07958–16.
Adv. No. 181–0420.

United States Bankruptcy Court, E.D. New York.

Oct. 24, 1983.

Stroock & Stroock & Lavan, New York City, for plaintiff; Robin E. Keller, New York City, of counsel.

Bosworth & Marchese, for Howard S. Bass; Andrew M. Marchese, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is an adversary proceeding brought by the trustee of North American Dealer Group, Inc., also known as North American Dealers Services, Inc. ("NADG", "NADS" or "the debtor"), Daniel McColley (the "plaintiff" or the "trustee"), for the turnover of a piece of real property known as 5 Merrywood Drive, West Orange, New Jersey ("the Merrywood house" or "the Merrywood property"). The defendants are How-

ard S. Bass ("Bass"), the former executive vice president and principal stockholder of the debtor, the Brooklyn Savings Bank and the Internal Revenue Service ("IRS"). Legal title to the Merrywood property is held by Bass, but the trustee contends that the debtor is its equitable owner and that, consequently, it is part of the debtor's estate. The IRS was made a defendant in the action because it has a tax lien on the property arising out of Bass's tax liabilities (Tr., 3/1/83, p. 92), but it has agreed to allow a sale of the property with its lien, if any, to attach to the proceeds. *Id.* at 93. The Brooklyn Savings Bank is a nominal party and no relief is requested against it.

These are the facts:

NADG filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 1101 *et seq.*, on December 24, 1980. It was converted, on consent of the debtor, to a liquidation case under Chapter 7 of the Code, 11 U.S.C. § 701, *et seq.*, on February 12, 1981. On April 22, 1981, Daniel McColley, the plaintiff in this case, was elected trustee by the debtor's creditors pursuant to section 702 of the Code.

According to the schedules filed with this court, at the time of filing the petition for reorganization, NADG had assets valued at approximately $2,000,000, secured indebtedness of approximately $1,009,870, and unsecured indebtedness of approximately $25,-000,000. The company was founded in 1973 by Bass and a partner and engaged in the business of selling extended automobile warranties throughout the United States. (Tr., 3/7/83, p. 52) The debtor had been under the control of Bass, its principal stockholder, until he sold his shares of stock in the corporation on May 19, 1980, to an entity known as Carexco, Inc. ("Carexco").

The debtor's Schedule B–1, the list of real property owned by it, lists the Merrywood house as an asset. It was purchased on July 15, 1977, as a residence for Bass, who still lives in it, from Michael and Gail Klebanoff for $172,000, subject to a first mortgage issued by the Brooklyn Savings Bank of $82,500 and a purchase money mortgage

of $29,500. The debtor's books and records show that it had either "loaned" money to Bass to pay various expenses associated with the purchase, or that it had paid the expenses on the property directly. For instance, the closing statement, which was marked Plaintiff's Exhibit 2 in evidence, lists the following:

"Balance paid on closing $44,313.05

\* \* \*

PURCHASER'S DISBURSEMENTS

New Jersey Real Title Insurance Company; title search and insurance and recording fees $754.20
Cullen and Dykman; counsel fees for preparation and closing of first mortgage loan 500.00
Brooklyn Savings Bank; escrow for taxes and insurance 955.06"

The debtor's books and records show a check to Howard Bass, issued on July 15, 1977, for $45,000 and designated as an "officer loan"; a check to Brooklyn Savings Bank dated July 15, 1977, for $955.06 which is designated "interest expenses," a check to Cullen and Dykman for $500 designated "legal fees atty"; and a check to New Jersey Realty Title Co., dated July 15, 1977, for $754.20, designated "title on house" and "officer loan." (Compare Plaintiff's Exhibits 2, 3, 4, 5, 6, Tr., 3/1/83, pp. 62–67; 3/9/83, pp. 37–39) The books also show a check for $750 issued on July 15, 1977, to the order of Michael and Gail Klebanoff, the sellers who had taken back a purchase money second mortgage on the property. This was designated in the NADG cash disbursement journal as "house closing" and "officer loan," but the purpose of that check is otherwise unclear from the record. (*See* Plaintiff's Exhibits 4, 6; Tr., 3/1/83, p. 65.) What is clear, however, is that the closing expenses were paid by NADG, either directly or through payments designated as "officer loans."

These were not the only NADG funds that were paid out for the Merrywood house, however. The trustee testified that his investigation of the debtor's books revealed that after the purchase, checks were issued by it to make some of the payments on the first mortgage held by Brooklyn Savings Bank as well as to pay two late charges, (Tr., 3/1/83, pp. 82–83, 117). Since Mr. McColley has been trustee, he has con-

tinued to pay on this mortgage and has made all of the required payments so that it is up to date. *Id.* at 52, 53, 83. Taxes are apparently included in the mortgage payments. *Id.* at 52. The second mortgage provided for payments over the course of three years, (*see* Plaintiff's Exhibit 2) and was to have been satisfied at a time before the debtor's petition was filed. During this period, NADG apparently made these mortgage payments. (Tr., 3/9/83, pp. 48–49) Indeed, Bass admitted that he did not know if he made any mortgage payments at all on the property. *Id.*

Other payments were made by the debtor. The parties stipulated that from July 15, 1977, when the property was purchased, to the time of the bankruptcy, it paid substantial amounts toward improvements, maintenance, and the purchase of appliances for the property, either directly or through officer loans. (Tr., 3/1/83, pp. 85, 88–89). Similarly, it was stipulated, that Bass also expended substantial sums in making improvements, repairs, and purchasing appliances. *Id.* at 85. Although, since the petition was filed, there have been either no payments, or very minor ones, by the debtor or the trustee, for repairs, improvements, or appliances on the property, *id.* at 91, the trustee has paid for insurance, which was placed in his name sometime after his appointment. *Id.* at 116. Bass has never objected to the trustee making these payments, *id.* at 117; indeed, the trustee had obtained his own insurance only after being informed that Bass's insurance on the property had lapsed and after Bass or his attorney had requested him to obtain it. *Id.* at 133. The trustee took other action at their request. After he was informed that the Brooklyn Savings Bank had commenced foreclosure proceedings against the property, he was requested by one of them to take action to halt the foreclosure, which he did. *Id.* at 134.

Bass has continued to live in the property. According to Paragraph V, subdivision (f) of the contract for the sale of his stock, Plaintiff's Exhibit 1, he was to pay $1,200 a month to NADG as rent for the Merrywood house. Since the trustee was elected, Bass has made no rent payments to him, (Tr., 3/1/83, pp. 114, 132) except for the monthly payments of $1,200 which I ordered him to make commencing on April 1, 1983, to be held in escrow by the trustee pending the decision in this case. Nor is there any indication in the books and records of the debtor that rent was received before the trustee's appointment although there is a memorandum from a bookkeeper indicating that Bass was credited with two months' rent, although the money had not been received. *Id.* at 114. (*But see* Tr., 3/9/83, p. 86 (where Bass claims he paid rent)).

As noted above, Bass's stock in NADG was sold on May 19, 1980, to Carexco. This was a company established by Richard Childs, a principal of Properties Insurance Company, apparently for the purpose of holding the stock in NADG. Childs was also an officer of Carexco. (Tr., 3/1/83, p. 46) Properties Insurance Company provided insurance for the car warranty contracts which were the heart of NADG's business.

The agreement of sale provided for all of Bass's stock in NADG to be sold to Carexco. The only cash Bass received at the time of sale was $12,500; he was also to receive monthly payments of $12,500 to total $200,000 and $500,000 in corporate loans he owed were to be forgiven. (Plaintiff's Exhibit 1, ¶ IIa; VIe(i)) In addition, he was to receive $1,375,000 from service contracts sold by NADG at the rate of $3 per contract. *Id.* at IIb. In the event that NADG discontinued operations with no financial benefit to itself or the buyer, however, there was to be no liability for the $1,375,000. The contract also provided that NADG was to pay specified expenses incurred in connection with the sale. In addition, it contained numerous other detailed provisions that are not directly relevant here. (*See* Plaintiff's Exhibit 1) Payment of some of the purchase price, apparently $200,000, although the agreement is not clear, was also guaranteed in a collateral agreement by Richard Childs and Gremesco, Inc., a corporation of which he was president. (Defendant's Exhibit O)

Annexed to the contract is a Schedule H, entitled "Real and Tangible Property Owned by NADS and/or its Other Corporate Entities as of November 21, 1979 and continuing to April 21, 1980." Among other entries is the following:

"5 Merrywood Drive, West Orange, New Jersey Bass Residence (subject to Consultant Contract)"

Next to this typewritten entry is a handwritten note, "Deed Titled in name of Howard Bass"; under this note are the initials "HB" apparently initialing that notation. The schedule contains other properties, including real estate in Staten Island, Palm Springs and New Jersey. It includes the entries "2 boats (mortgaged)" and "various leased cars and office fixtures, including leased computer and CRT System." At the end of the schedule, the names North American Dealer Group, Inc. and North American Dealer Services, Inc. are typed in below which it is signed "by Howard Bass."

While Schedule H identifies the property as being NADS's property only up to April 21, 1980, the body of the contract of sale makes it clear that at the time of sale Bass covenanted that the house belonged to NADS (NADG). The contract provides:

"VI.d. Annexed as Schedule H hereto is a list of all real and tangible assets of NADS as of November 1, 1979 and continuing to the date of this Agreement and Bass represents that none of these assets has been sold, assigned or pledged except as is specifically identified on said schedule and as may have been sold by George Jacobs [a former partner of Bass] without the knowledge of Bass."

The contract of sale also included a great many detailed provisions regarding the Merrywood house. They are:

"V.f. For the continued benefit of NADS' ability to call upon the services of Bass, it is required that Bass continue to reside at the premises identified as 5 Merrywood Drive, West Orange, New Jersey, and Buyer acknowledges the existence of and ratifies the two year lease entered into between NADS and Bass covering the aforementioned premises at a net monthly rental of ONE THOUSAND TWO HUNDRED ($1,200) Dollars, provided carrying charges do not exceed TWO THOUSAND FIVE HUNDRED ($2,500) Dollars per month, and any excess shall be paid by Bass as additional rent.

"(i) Prior to the expiration of the original two year lease term, Bass shall have the option to purchase aforesaid premises in the sum of TWO HUNDRED THOUSAND ($200,000) Dollars.

"(ii) If the option to purchase is not exercised, Bass shall have the option to renew the lease for an additional two years at a fair market rental to be agreed upon between Buyer and Bass, but, if they cannot agree, to be determined by three arbitrators who shall be commercial men engaged in the real estate business with one arbitrator chosen by each party and the two thus chosen to select the third. The arbitration shall take place in Cranford, New Jersey, pursuant to such rules as the arbitrators deem just and necessary.

"(iii) In the event the additional rental option is exercised, Bass shall have the option to purchase the premises at the fair market value, provided such option is exercised prior to the end of the renewed term. If the parties cannot agree on a fair market purchase price, said price is to be determined by the arbitrators chosen in the manner as hereinbefore described.

"(iv) If the lease or purchase options are not exercised within the stated period, they shall lapse and have no further force or effect.

"(v) The term 'carrying charges' as used in Subparagraph (e) shall include pool maintenance, telephone, gardener service, tree service, plumbing repairs, electricity, gas and general maintenance of house and major appliances.

"(vi) Bass shall have the right during the original and renewal term, if any, to cancel the lease upon thirty (30) days written notice.

"(vii) A copy of the lease is annexed hereto as Exhibit G."

The contract contained one other clause relating to the Merrywood house:

'VIII.g. It is agreed between Buyer and Bass that neither NADS nor Buyer has any claim against any of the personal property located in the premises hereinbefore identified as '5 Merrywood Drive, West Orange, New Jersey' except to the extent that equipment necessary to the daily operation of NADS is found on the premises."

Additionally, the contract contained an integration clause providing that the writing was the sole agreement of the parties:

"a. This contract shall be interpreted in accordance with the Laws of the State of New York and shall embody the whole agreement between the parties, unless by written document signed by both parties dated contemporaneously or subsequently hereto, the parties have agreed to modify the terms and conditions hereof."

The contract of sale also provided in detail for a consulting contract. Under its terms, NADG was to pay Bass a salary; make payments on life insurance and medical policies for his benefit; convey a car to him and pay the car insurance; give him a green onyx dining room table, and possibly forgive money owed by Bass to NADG. (Tr., 3/9/83, pp. 76, 79–82; Defendant's Exhibit C)

Additionally, it provided for the disposition of one of three lots located at Monmouth Beach, New Jersey. Bass had bought these three lots, perhaps with money "borrowed" from NADG, and title to them was taken either by Bass personally or by Bass Realty Corp. (Tr., 3/9/83, p. 118) The consulting contract, however, provided that title to one of these properties was to be transferred to Bass. (See Defendant's Exhibit C, ¶ 10) Bass admitted that this implied that he was to convey title to the two other properties to NADG, but he does not believe he did so. Id. at 119.

The provisions of the contract of sale were at least partially adhered to. Bass claims he made rental payments to the company, (Tr., 3/9/83, p. 86, but see Tr., 3/1/83, p. 114) and NADG paid carrying charges on the property. No lease to the premises, however, was ever prepared or signed by Bass. (Tr., 3/7/83, p. 29, see also, Tr., 3/1/83, p. 110)

Bass also received some of the payments provided for under the contract. These were: $86,307.72 of the $200,000 owed, and consulting fees that totaled $94,230.64. (Defendant's Exhibit M)

*The Contentions of the Parties*

The trustee contends that the Merrywood property must be turned over to the estate because, even though Bass unquestionably holds legal title to it, since the deed is in his name, NADG is the equitable owner. The trustee maintains that NADG bought, paid for, and maintained the property, and that Bass admitted that it was NADG property in the agreement of sale of his stock to Carexco.

Bass, on the other hand, contends that the property is his. He claims that the property was his from the time it was purchased since most of the money that came from NADG for the purchase price, and various closing costs, was loaned to him by the corporation; consequently, he, not NADG, paid these expenses. He further contends that he retained a security interest in the house:

"[T]he house was to remain titled in Bass' name until such time as the terms and conditions, including payment, of the agreement had been satisfied, at which time Bass would turn title of the house over to NADS. If, however, Bass determined that he wished to remain in the premises subsequent to the satisfaction of the agreement's terms and conditions, then he could either pay $200,000.00 to NADS pursuant to the 'option' to purchase the premises ... or reduce the ultimate purchase price of his stock by that amount."

Defendant's post-trial brief at 6; (See also Tr., 3/7/83, p. 28).

In support of his case, Bass adduced testimony from Bernard Hubscher ("Hubsch-

er"), who had acted as his attorney in negotiations for the sale of stock in the debtor. According to Hubscher, Bass came to him when he was having trouble at NADG stemming from an agreement with Proprietors Insurance Company. Proprietors had issued extended automobile warranty policies sold by NADG and either Proprietors or its agent, Richard Childs, was threatening to cancel the program. (Tr., 3/7/83, p. 5) In Hubscher's opinion, the consequence of Proprietors' cancelling its insurance contracts with NADG would have been to put it out of business. *Id.* at 19. *See also id.* at 23 ("When I came into the picture, the corporation was going to be put out of business by Mr. Childs") Consequently, Bass went to Hubscher, who began representing him in negotiations for the sale of the stock in the business several months before the sale was actually consummated. *Id.* at 5–6. Hubscher explained that, while the negotiations were carried on for months, the actual drafting of the final agreement was hurried:

> "I received a call from Mr. Childs [and he said that] either the agreement was signed within a day or two, as I recall, or there would be no agreement. So this document was rushed up to that extent."

*Id.* at 8.

Hubscher contended that the following occurred during negotiations:

> "There was a lot of conversation what to do with the man's home to make sure that he keeps his house. And the only way that anybody was able to figure out anything was to have him pay some sort of rent. At the end of the time period if the house—if he had received his million and a half, or whatever it is, he would then pay them back $200,000. Or in the interim he realized he could sell the house and realize a profit, he would also have to make a payment back to them. Otherwise it was his house."

*Id.* at 12.

Hubscher also testified that Bass had been concerned about having no security for the money due him for the sale of his stock. He then explained that:

> "[T]he only security we were able to get out of them, period, was that $200,000 or $250,000 security for first monies coming into—rather the first monies due Bass, that a [*sic*] Dick Childs would personally guarantee, or one of his corporations. I forget which."

*Id.* at 13. *See also id.* at 32. ("There were really no security agreements ... except for the guarantee ... by Mr. Childs.")

Hubscher claimed that Schedule H, the listing of property "owned by NADS," which includes the Merrywood house, should not be understood to represent what it claims to represent. Instead, he explained:

> "This was a listing of all the property that was ever involved out of NADS. In fact, if you look at Schedule H, which was prepared, as I said before, this entire agreement was typed by Childs' attorney on their word processing machine. They threw in 5 Merrywood Drive, and at the time I assume this agreement was signed, Bass initialed the title in the name of Howard Bass."

*Id.* at 30.

Bass, too, claims that the written contract does not reflect the actual agreement reached by the parties. He also contends that Schedule H does not mean what it says. He insisted that the following occurred during the negotiations for the sale of the stock:

> "I was asked to bring forward a list of all property, either paid for in full or in part by North American funds. I brought that down in handwritten form and [Carexco's attorney] put it down in this form. Upon review I made a number of notes. All these notes are mine on here. (Indicating) All right. I made it clear at that time that I—This was— Again, once this was done we went to a subsequent meeting. This all just didn't happen in five seconds. I brought the list forward, that was just a request at that point, it didn't constitute in my mind a schedule. I wasn't about to sign a contract yet. They said bring a property list in, everybody was negotiating.

"At that point we got into a second part of the negotiation. They said that these are the properties we're going to take title to... These are the properties, for these set reasons, that we want title to.

"I told them that ... I took exception to this piece of property that I claimed ownership to, to 5 Merrywood Drive. Subsequently, what happened upon the final signing of this agreement is that I counseled with Childs and we made a firm agreement and signed off on here the intent of which was that this property would be subject to my consultant contract and the full payment of everything owed me under the contract and consultant contract. That I would, in fact, made [*sic*] rental payments on the property. But at that time, when asked—when I asked, 'Why rental payments,' they said because we want to expense the $2,500 that you've got in your consultant contract with respect to improvements.

"So they just wanted to establish a rent flow, which is why they put that nebulous language in there about the so-called existing lease. It's obvious if we subpoena [their attorney] and resubpoena Mr. Hubscher and anybody else to the negotiation, they would have to agree that there was no such thing as an existing lease. . . .

"The final determination was that I was going to hold that property, but they wanted to establish, you know, a write-off for a number of reasons and a lot of it escapes me at this late date, and it had—I know that it included, to a degree, positions that they wanted to take with respect to a lot of money that had been paid into this house over a period of years cofferers [*sic*] of the corporation."

(Tr., 3/7/83, pp. 93–95)

Section 541 of the Code, 11 U.S.C. § 541, provides in pertinent part:

"(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located:

"(1) ... all legal or equitable interests of the debtor in property as of the commencement of the case."

Section 542 provides in pertinent part:

"(a) ... [A]n entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."

The resolution of this matter, then, depends on whether the debtor has a legal or equitable interest in the property under the applicable state law.

The legal theory under which the trustee proceeds is that Bass is a constructive trustee of the Merrywood property. "A constructive trust," Judge Cardozo explained, "is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919). *Accord, Moses v. Moses,* 140 N.J.Eq. 575, 579, 53 A.2d 805, 808 (Ct. Errors & Appeals, N.J.1947). "There may be a constructive trust where the retention of the property would unjustly enrich the person retaining it." *Moses, supra,* at 580, 53 A.2d at 808.

The Supreme Court of New Jersey has recently explained the elements necessary for the imposition of a constructive trust:

"Although *Gordon v. Griffith* [113 N.J.Eq. 554, 168 A. 57] ... indicates that fraud is an essential element of a constructive trust, the better view as expressed in our later decisions is that a constructive trust will be impressed in any case where to fail to do so will result in an unjust enrichment... Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not

limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property."

*D'Ippolito v. Castoro,* 51 N.J. 584, 588–89, 242 A.2d 617, 619 (1968).

A constructive trust is not a "trust" in the usual sense. A New Jersey court has explained:

"The doctrine of equitable relief is grounded in the requirement of conscience and good faith in one's relations with another, measured by the common standard of civil right and justice. Whenever a legal estate is vested in A, but under circumstances which according to settled equitable doctrine entitle B to the land, or some interest therein, equity secures B's rights, not by annulling or ignoring A's legal estate, but by charging A's conscience with a trusteeship for B's benefit and the duty of consummating B's equitable ownership by a conveyance."

*Moses, supra,* at 581, 53 A.2d at 809.

■ The "constructive trust," then, is essentially a legal fiction by which a holder of title can be made to convey that title to one wrongfully deprived of ownership. Whether NADG has wrongfully been deprived of the Merrywood property depends primarily upon whether I believe Bass and Hubscher.

I have listened to the witnesses and I have observed their demeanor as they testified during the course of this trial and I do not believe Bass when he claims that the Merrywood property is his, nor do I believe him when he claims that he has a security interest therein to guarantee the payments due him.

As to the ownership of the property, while some of the money that went to the purchase price, the mortgage payments, and other expenses associated with the Merrywood house, was shown on the NADG books as having been officer loans, other expenses were paid directly by the corporation. Therefore, I believe that the most persuasive evidence as to ownership of the property is Bass's own admission on Schedule H of Plaintiff's Exhibit 1, that the property was "PROPERTY OWNED BY NADS" and was "subject to consultant contract." I believe that the handwritten note "deed titled in name of Howard Bass" on Schedule H means what it says—that the deed was held by Bass, and I believe that it means no more. If there had been any understanding that the property belonged to Bass, equitably as well as legally, he would have written "property of Howard Bass" instead of the convoluted phrase "deed titled in name of Howard Bass."

I likewise do not believe Bass's claim that he had a hidden security interest in the Merrywood property. He would have this court believe that an experienced businessman such as he is, when represented by an attorney, entered into an oral security agreement totally different from the written contract which he signed. He would further have this court believe that this detailed written contract, containing an integration clause as well as numerous provisions providing for the disposition of the house, was not in fact the bargain entered into between the parties. This is incredible, particularly since there was no deadline, other than that set by the parties, that could have prevented them from putting the bargain they made into the written contract. Not only did Bass's demeanor on the stand convince me that this was so, but I believe, given the leverage Childs had over Bass as a result of his threat to cancel the insurance agreement with NADG, that Bass could get no more security than that which he got ... the personal guarantees of Childs and Gremesco.

The only weak reed Bass has to hold onto in his argument is the fact that the title to the property was not conveyed to the debtor at the time of sale or shortly thereafter, but there are explanations for the failure to convey that are far more credible than the security interest story. Perhaps the company was in such chaos because of its possible imminent collapse when Carexco took it over (it filed a petition for relief under Chapter 11 only seven months later) that having the property conveyed was the last thing it would attend to. Perhaps the par-

ties agreed that the conveyance would be put off until such time as Bass failed to exercise his option to purchase. At any rate, that the title to the property continued to be in Bass's name is not surprising when one considers that title to other pieces of property, the two of the three Monmouth Beach lots, which concededly were the debtor's property, although held in the name of Bass personally or Bass Realty, (see Defendant's Exhibit C) was never transferred to NADG.

■ In short, I believe that Bass, an officer of NADG and consequently its fiduciary, abused his confidential relationship with the corporation by wrongfully holding legal title to the Merrywood property, and I find that his continued retention of the title unjustly enriches him. Given Bass's own admission in Schedule H that the Merrywood house is the debtor's property, I find that the evidence is clear and convincing that NADG, and not Bass, has equitable title to it. Consequently, Bass must be directed to transfer title to the trustee. Any claim of the IRS will attach to the proceeds pursuant to the agreement between it and the trustee.

■ The trustee has asserted a claim for Bass's use and occupancy of the Merrywood Drive property from May 19, 1982 through March 31, 1983, at the rate of $1,200 per month, as well as the payments made by Bass at that rate from April 1, 1983 to date, which have been held in escrow by the trustee. In view of my finding that the Merrywood Drive house is property of the estate, I find that Bass is liable for its use and occupancy during the period claimed by the trustee and that the trustee is authorized to deposit the funds held in escrow by him into the general funds of the estate.

The defendant, Howard S. Bass, is directed to transfer title to the premises known as 5 Merrywood Drive, West Orange, New Jersey, to the plaintiff, Daniel McColley, trustee of North American Dealer Group, Inc., also known as North American Dealer Services, Inc., and judgment is granted in favor of the plaintiff and against the defendant in the amount of $12,000.

Submit judgment in accordance herewith.